No. 97,279

STATE OF KANSAS, *Appellee*, v. ERIC JONES, *Appellant*.

(197 P.3d 815)

Opinion filed December 12, 2008.

*B. Joyce Yeager*, of Yeager Law Firm, L.L.C., of Overland Park, argued the cause and was on the brief for appellant.

*Constance M. Alvey*, assistant district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Paul J. Morrison*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.: Eric Jones appeals his jury trial conviction for premeditated first-degree murder. He raises three issues: (1) Whether the district court erred in admitting the deceased victim's hearsay statement as a dying declaration; (2) whether the prosecutor committed prosecutorial misconduct in closing argument; and (3) whether the district court committed clear error in failing to instruct the jury on certain lesser included offenses. Finding no reversible error, we affirm Jones' conviction.

## FACTUAL OVERVIEW

The sequence of events leading to the fatal shooting of the victim, Brannon Wright, began with a social gathering at the Kansas City, Missouri, home of Maleka Henson, Jones' girlfriend with whom he had been living while recuperating from ankle surgery. Initial party guests included Xavier Miller and his girlfriend, August

Peeler. Later arrivals included Dionte Harris, his girlfriend, Keona Redmond, and the victim, Wright.

Henson retired to bed early. Harris, Redmond, and the victim, Wright, subsequently left the party. Miller and Peeler stayed the night at the Henson residence. The following morning, Henson discovered approximately $300 to $400 missing from her purse and advised Jones of her discovery. After Miller and Peeler denied having any knowledge about the missing money, Jones, accompanied by Henson and Miller, traveled to a Kansas City, Kansas, residence to question Harris. En route, they picked up another friend, Terrae Johnson.

Henson's door knocking awakened Harris, who denied any knowledge of the missing money and then checked the pockets of the sleeping Redmond. When Harris and Henson went outside, Harris observed a car containing Jones, Miller, and Johnson park behind Harris' vehicle. Jones exited the car and inquired as to Wright's whereabouts. After advising Jones that Wright was asleep in his vehicle, Harris awakened Wright, told him to exit the vehicle, and advised him of the missing money. Wright denied any knowledge of the missing money and sat on the vehicle's trunk.

According to Harris, he observed that Jones had a firearm and exhorted Jones to "hold on" while Harris awakened his girlfriend. However, Jones retorted that Harris should not worry because it was going down in 3 seconds, whereupon Jones drew the weapon and commenced firing at Wright. Harris made a hasty retreat toward the backyard and over a brick wall, eventually circling around to enter the residence by the back door and awaken his girlfriend. Nevertheless, Harris said that he saw Wright kick his foot in front of the gun barrel; that he heard Wright screaming that he did not take any money; that Wright tried to get away and move to the front of the vehicle, but Jones continued to fire; that Wright attempted to grab the gun; and that he heard several shots, perhaps five, with some pauses between shots. At trial, Harris identified the weapon.

Henson, Miller, Jones, and Johnson fled the scene and returned to Henson's home, where Peeler observed that the group was behaving as if something had happened. Miller and Johnson left

Henson's house by vehicle, only to be detained by law enforcement a short distance away who discovered Johnson in possession of the weapon used in the shooting. Jones changed clothes and placed his blood splattered clothing in a plastic bag which was subsequently retrieved from under a back porch. A button was missing from the discarded shirt, which matched a button found at the shooting scene. The bag contained only one shoe, with the matching shoe found in a bedroom in Henson's house.

Meanwhile, Brian Taylor, a firefighter paramedic, and Brett Mc-Coy, an ambulance paramedic were responding to the shooting scene. Taylor found Wright lying in the street, critically injured. He rode with McCoy in the ambulance en route to the hospital. McCoy observed a number of gunshot wounds and determined that Wright was paralyzed in all four limbs. Wright was conscious and able to communicate, at one point asking McCoy whether he was going to die, to which McCoy did not directly respond. McCoy spoke with Wright in order to keep him awake and to confirm that his airway was open. McCoy asked if Wright knew who had shot him, eliciting the response, "53rd and Brooklyn." When asked if that was his address, Wright said, "no." McCoy then asked if that was the address of the shooter, to which Wright answered, "yes." When asked again who shot him, Wright responded, "E," which was subsequently revealed as a nickname for the defendant, Jones.

Ultimately, Wright died of complications of the paralysis caused by the gunshot wounds. Jones was charged, tried, and convicted of premeditated first-degree murder. After a denial of Jones' new trial motion, the district court sentenced him to a hard 25 life sentence. Jones timely appealed his conviction.

## ADMISSIBILITY OF VICTIM'S STATEMENTS

Jones states that his first issue is whether the district court erred in admitting, as a dying declaration, the victim's hearsay statements to the paramedics, suggesting an evidentiary challenge based upon our hearsay statutes. However, his arguments concentrate on the Confrontation Clause of the Sixth Amendment to the United States Constitution as interpreted in *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004). More specifically,

Jones principally argues against applying the exception to his confrontation right referred to as forfeiture by wrongdoing, which was discussed in *Crawford* and adopted by this court in *State v. Meeks*, 277 Kan. 609, 88 P.3d 789 (2004).

The appellant's imprecision in defining his arguments follows an amalgamated ruling by the district court. Although the parties had only argued the applicability of a hearsay exception under our state statutes, the district court opined that the victim's statements were admissible under *Crawford* and *Meeks*, which were cases addressing the Confrontation Clause constitutional question. The district court mentioned that these cases approved the doctrine of forfeiture by wrongdoing. The court also found that the declarant believed that he was dying and that he was excited at the time, suggesting the applicability of the hearsay exceptions in K.S.A. 2007 Supp. 60-460(e) and (d)(2). Further, the court found that the statements were reliable.

The State's brief begins by reciting that the standard of review for the admission of a statement under the Kansas hearsay statutes is abuse of discretion. However, it then embarks on a constitutional analysis of whether the victim's statements were testimonial in nature, so as to implicate the Confrontation Clause. The State summarily concludes that the statements were not testimonial, thus disposing of the constitutional question and proceeding to the remaining question of the applicability of a hearsay exception under K.S.A. 2007 Supp. 60-460. However, after arguing that the district court did not abuse its discretion in admitting the statements under the dying declaration hearsay exception of K.S.A. 2007 Supp. 60-460(e), the State returns to the constitutional right of confrontation issue to discuss the forfeiture by wrongdoing exception.

Accordingly, we take the liberty of arranging the various questions in our own order. First, we will discuss the State evidentiary question and then the federal constitutional implications.

### Hearsay Exception

Neither party disputes that the victim's statements, offered through the paramedics, constituted hearsay evidence which would be inadmissible unless an exception listed in K.S.A. 2007 Supp. 60-

460 is applicable. As noted, the district court intimated that both the dying declaration exception of K.S.A. 2007 Supp. 60-460(e) and the excited utterance exception of K.S.A. 2007 Supp. 60-460(d)(2) applied to the facts of this case. On appeal, neither party even mentions the excited utterance exception, and we will not analyze that provision. See *State v. Walker*, 283 Kan. 587, 594, 153 P.3d 1257 (2007) (issue not briefed deemed waived or abandoned).

K.S.A. 2007 Supp. 60-460(e) specifically provides that a dying declaration is an exception to the hearsay rule if the court finds that the statement of the deceased was made "(1) voluntarily and in good faith and (2) while the declarant was conscious of the declarant's impending death and believed that there was no hope of recovery." With respect to the second element of the exception, the district court found that Wright certainly had reason to believe that he was dying at the time of the statements. The evidence supports that finding. Wright had sustained multiple gunshots wounds which left him paralyzed in all four limbs. Pointedly, Wright asked one of the two paramedics who were working on him in the ambulance whether he was going to die, manifesting an awareness that he was on the brink of death. Just as pointedly, the paramedic did not give Wright assurance that he would live, but rather responded that the paramedics would do everything they could to keep him from dying.

With respect to the first element, the district court did not specifically say that the statements were made voluntarily and in good faith. However, the circumstances under which the statements were obtained do not suggest that they were involuntarily made. Moreover, the district court specifically found that the statements were reliable which would by necessity encompass the good-faith element. Therefore, we find that the victim's statements to the paramedics fell within the dying declaration exception to the statutory hearsay.

### Confrontation Clause

In *Crawford*, the United States Supreme Court abrogated its holding from *Ohio v. Roberts*, 448 U.S. 56, 66, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980), which permitted the admission of an una-

vailable witness' statement if the statement bore an adequate indicia of reliability. *Crawford* held that the Confrontation Clause of the Sixth Amendment barred "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." 541 U.S. at 53-54. Here, there is no dispute about Wright being unavailable to testify or about Jones not having an opportunity to cross-examine Wright. Rather, the State contends that the victim's statements to the paramedics were not testimonial in nature, and, therefore, the Confrontation Clause does not apply.

The *Crawford* Court did not provide a comprehensive definition for "testimonial" but stated that, at a minimum, it applied to prior testimony at a preliminary hearing, before a grand jury, or at a former trial and to police interrogations. 541 U.S. at 68. Subsequently, this court discussed the question in depth and explained:

"Factors to be considered in determining whether a hearsay statement is testimonial include: (1) Would an objective witness reasonably believe such a statement would later be available for use in the prosecution of a crime? (2) Was the statement made to a law enforcement officer or to another government official? (3) Was proof of facts potentially relevant to a later prosecution of a crime the primary purpose of the interview when viewed from an objective totality of the circumstances, including circumstances of whether (a) the declarant was speaking about events as they were actually happening, instead of describing past events; (b) the statement was made while the declarant was in immediate danger, *i.e.*, during an ongoing emergency; (c) the statement was made in order to resolve an emergency or simply to learn what had happened in the past; and (d) the interview was part of a governmental investigation?; and (4) Was the level of formality of the statement sufficient to make it inherently testimonial; *e.g.*, was the statement made in response to questions, was the statement recorded, was the declarant removed from third parties, or was the interview conducted in a formal setting such as in a governmental building?" *State v. Brown*, 285 Kan. 261, Syl. ¶ 15, 173 P.3d 612 (2007).

The first persons to attend to Wright after the shooting were the paramedics who accompanied him in the ambulance. Wright was paralyzed and obviously aware that he had been seriously wounded; there was apparently no opportunity for him to be interrogated by an investigating law enforcement officer at the scene. Although Wright was in the midst of a medical emergency, the paramedics' questions at issue here were not designed to deal with the imme-

diate danger. Rather, the questions about the identity of the shooter related to past events and sought information above and beyond what was necessary to administer medical care. Accordingly, Wright would have reasonably believed that his answers would be passed along to law enforcement officers and would later be available for use in prosecuting the shooter.

Granted, the paramedics testified that the questioning of a patient fulfills a medical purpose by assuring the paramedic that the patient's airway remains open and by assisting in maintaining the patient's consciousness. However, that purpose does not explain the content of the questions which were asked. The fire department paramedic acknowledged that the information obtained through their questioning often helps the police where the patient has been transported from the scene quickly, before any police investigation could occur. Here, the specific questions asked were obviously designed to obtain such helpful information for law enforcement. In that light, the interview formed a part of a governmental investigation into past events.

In short, Wright's statements to the paramedics were testimonial in nature and their introduction into evidence would violate Jones' confrontation right, unless an exception applies. *Crawford* left open the possibility of two exceptions to a person's constitutional right to confront witnesses, dying declarations and forfeiture by wrongdoing.

In a footnote, the *Crawford* opinion noted that the existence of the dying declaration exception to the general rule of exclusion in criminal hearsay law cannot be disputed. The Court did not need to decide whether the Sixth Amendment incorporated this exception in order to make the *Crawford* decision.

"Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. [Citations omitted.] We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis*." 541 U.S. at 56 n.6.

*Crawford* also continued to accept the rule of forfeiture by wrongdoing because it extinguished confrontation claims on equitable grounds; it did not purport to be an alternative means of

determining reliability. 541 U.S. at 62. The rule provides that when a witness is absent by the criminal defendant's procurement, the defendant cannot assert a violation of his or her constitutional right to confrontation. *Reynolds v. United States*, 98 U.S. 145, 158, 25 L. Ed. 244 (1878).

Subsequently, in *Meeks*, this court considered and applied the forfeiture doctrine in light of *Crawford*. There, Meeks was charged with murdering a man who died from a gunshot wound. However, when the first police officer arrived on the scene, the victim was still alive. The officer asked the victim who had shot him, and the victim replied, " 'Meeks shot me.' " 277 Kan. at 611. On appeal from his conviction of premeditated first-degree murder, Meeks challenged the trial court's admission of the victim's statement as violating his Sixth Amendment right to confront the witnesses against him.

*Meeks* found that a preponderance of the evidence established that the declarant could not testify at trial because the defendant had murdered the declarant. Accordingly, *Meeks* held that the defendant had "forfeited his right of confrontation and waived any hearsay objections," and, accordingly, the deceased victim's statements were properly admitted at trial. 277 Kan. at 616.

Jones acknowledges the *Meeks* decision, but argues that the forfeiture by wrongdoing doctrine should not be applied in all cases. Citing to the post-*Crawford* decision in *Gonzalez v. State*, 195 S.W.3d 114 (Tex. Crim. 2006), Jones suggests that the defendant's motive for killing the declarant should be considered in determining whether the rule should be applied. In contrast, the State summarily asserts that under *Meeks* the rule of forfeiture by wrongdoing extinguishes any confrontation claim.

During the pendency of this appeal, the Supreme Court granted certiorari in a case that dealt with admitting the murder victim's unconfronted testimony at the trial of the accused killer under a doctrine of forfeiture by wrongdoing. We perceived that a decision in that case could impact the continued viability of our holding in *Meeks*. That decision has now been rendered. *Giles v. California*, 554 U.S. 353, 171 L. Ed. 2d 488, 128 S. Ct. 2678 (2008). *Giles* clarified that it is insufficient to merely show that the defendant

wrongfully caused the absence of a witness in order to admit the witness' unconfronted testimony under the forfeiture rule. The State must show that the defendant intended to prevent the witness from testifying. 554 U.S. at 359-61.

Applying the *Giles* holding to the case before us, the State was required to show that Jones killed the victim with the intent to prevent the victim from testifying against Jones in order to establish the admissibility of the victim's statement under the forfeiture doctrine. Presumably because *Meeks* had not delineated an intent requirement to invoke forfeiture, the State did not argue nor did the district court find that Jones' killing of the victim was effected with an intent to prevent the victim's later testimony.

Perhaps one could infer that Jones' actions in pursuing the victim around the vehicle and into the street, while discharging numerous rounds from his handgun, manifested an intent to make certain that the victim would not be alive to testify. On the other hand, given the presence of a number of other witnesses at the shooting scene, the killing would not have assured that the killer's identity would go undetected. Therefore, we are unwilling to declare as a matter of law that a preponderance of the evidence which was presented below showed that Jones killed the victim with the intent to prevent his subsequent testimony at the ensuing murder trial. Nevertheless, given our ruling below on the dying declaration exception, we need not remand for further proceedings.

As in *Crawford*, the issue presented in *Giles* did not require that the Supreme Court definitively decide whether the common-law hearsay exception for a dying declaration was incorporated into the Sixth Amendment's Confrontation Clause, *i.e.*, whether a dying declaration is an exception to the constitutional preclusion of unconfronted testimony. However, the Supreme Court again "acknowledged that two forms of testimonial statements were admitted at common law even though they were unconfronted," and proceeded to describe that "[t]he first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying." *Giles*, 554 U.S. at 358. Subsequently, in discussing the historical application of the forfeiture doctrine, *Giles* observed:

"The manner in which the rule was applied makes plain that unconfronted testimony would *not* be admitted without a showing that the defendant intended to prevent a witness from testifying. In cases where the evidence suggested that the defendant had caused a person to be absent, but had not done so to prevent the person from testifying—as in the typical murder case involving accusatorial statements by the victim—the testimony was excluded unless it was confronted or *fell within the dying-declaration exception.* Prosecutors do not appear to have even *argued* that the judge could admit the unconfronted statements because the defendant committed the murder for which he was on trial." (Emphasis added.) 554 U.S. at 361-62.

Accordingly, we are confident that, when given the opportunity to do so, the Supreme Court would confirm that a dying declaration may be admitted into evidence, even when it is testimonial in nature and is unconfronted. Here, the evidence was sufficient to establish that, when the murder victim made the declarations, he "was both on the brink of death and aware that he was dying." 554 U.S. at 358. Therefore, we find that the statements were admissible.

## PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT

Next, Jones contends that the prosecutor improperly argued matters which were not in evidence. Specifically, he points to the statements that (1) a button was torn off Jones' shirt by the victim as he lunged at Jones; (2) Jones did not want the victim to survive; (3) Jones wore one shoe; (4) Jones followed the victim into the street to shoot him; (5) Jones concluded that he must kill; and (6) a person does not bring a loaded gun without having the intent to use it. Jones also complains that the prosecutor said Jones procured the absence of Terrae Johnson and misstated the law of premeditation. He characterizes the prosecutor's comments as "surmise and conclusory," and contends that the misconduct during closing argument likely changed the result of the trial. We disagree.

Appellate review of an allegation of prosecutorial misconduct requires a two-step analysis. First, the appellate court decides whether the comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, the appellate court decides whether those comments constitute plain error; that is whether the statements prejudiced the jury against the

defendant and denied the defendant a fair trial. *State v. Albright*, 283 Kan. 418, 428, 153 P.3d 497 (2007).

In the second step of the two-step analysis, the appellate court considers three factors:

"(1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling. Moreover, the third factor may not override the first two factors unless the harmless error tests of both K.S.A. 60-261 [refusal to grant new trial is inconsistent with substantial justice] and *Chapman v. California*, 386 U.S. 18, [22,] 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) [(conclusion beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial)], have been met. [Citations omitted.]" *Albright*, 283 Kan. at 428.

The State reminds us that, although it is improper for an attorney to state facts which are not in evidence, a prosecutor is allowed considerable latitude in discussing the evidence and may draw reasonable inferences from the evidence which is in the record. *State v. Carter*, 278 Kan. 74, 80, 91 P.3d 1162 (2004). Moreover, misstatements of fact which are insignificant to the State's theory of the case are not considered to be an error so gross and flagrant as to have violated the defendant's right to a fair trial. *State v. Baker*, 281 Kan. 997, 1012-13, 135 P.3d 1098 (2006).

The prosecutor made the following comments that are relevant to Jones' argument:

"The premeditation. You heard Dionte testify as to the gunshots. It wasn't—it's a semiautomatic, but you have—to my understanding of guns, you have to load it. But what does he do? Pop, pop, pop. Then there is a pause. He had to follow him into the middle of the street to the point he can't get up any more because then he's paralyzed. So he has—he's aiming. He takes his time. Because he's going to make sure—because Brannon [victim] doesn't go down with the first shot. He's coming after him. He gets ahold of the shirt. The button is torn off. He's really got to finish the job now."

A review of the record discloses that the evidence of which Jones complains was admitted. A photograph of the shirt which Jones admitted wearing and which reflected a missing button was introduced into evidence, along with evidence that a similar button was found at the scene. There was testimony about Jones' broken foot

and the fact that his shoes were found in two different locations. The shooting incident commenced at a parked vehicle, but the victim was felled in the street near the opposite curb after sustaining numerous gunshot wounds. The prosecutor argued the reasonable inferences to be drawn from the facts.

Further, the prosecutor's closing argument did not suggest that Jones procured the absence of Terrae Johnson, but rather the prosecutor simply pointed out that it was convenient for the defendant to blame another person who was not present for the trial. Finally, Jones failed to cite us to the portion of the prosecutor's argument where he believes the law of premeditation was misstated, and we are unable to locate such a misstatement of the law.

In short, we find that the prosecutor did not state any facts that were not in evidence; that the prosecutor argued inferences which could be reasonably drawn from the admitted evidence; that the prosecutor's arguments fell within the latitude afforded to prosecutors to discuss the evidence; and that the prosecutor did not misstate the law applicable to premeditation. Nevertheless, even if we were to find isolated portions of the argument to have exceeded the permissible bounds, viewing the entire argument convinces us that any such error would fall far short of being reversibly gross and flagrant.

## ADDITIONAL LESSER INCLUDED OFFENSE INSTRUCTIONS

The district court instructed the jury on premeditated first-degree murder and the lesser included offense of intentional murder in the second degree. On appeal, Jones now contends that the jury should also have been instructed on unintentional second-degree murder, voluntary manslaughter, and involuntary manslaughter as lesser included crimes of first-degree murder. See *State v. Engelhardt*, 280 Kan. 113, 135, 119 P.3d 1148 (2005) (voluntary manslaughter and involuntary manslaughter, like second-degree murder, are lesser included offenses of first-degree murder).

Because Jones did not request the additional lesser included offense instructions, we apply a clearly erroneous standard of review. See *State v. Cooperwood*, 282 Kan. 572, 581, 147 P.3d 125

(2006). " 'Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. [Citation omitted.]' *State v. Saenz*, 271 Kan. 339, 346, 22 P.3d 151 (2001)." *State v. Trotter*, 280 Kan. 800, 805, 127 P.3d 972 (2006).

If the evidence would not have permitted a rational factfinder to find the defendant guilty beyond a reasonable doubt of the lesser included offenses, instructions on those additional offenses need not be given. *Engelhardt*, 280 Kan. at 134; *State v. Deavers*, 252 Kan. 149, 151, 843 P.2d 695 (1992), *cert. denied* 508 U.S. 978 (1993). Unintentional second-degree or "depraved heart" murder is a killing committed unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life. K.S.A. 21-3402(b). Involuntary manslaughter is a killing committed unintentionally but recklessly. K.S.A. 21-3404(a).

In *State v. Robinson*, 261 Kan. 865, 876-78, 934 P.2d 38 (1997), we discussed the requirements for unintentional second-degree murder.

"Both depraved heart murder and reckless involuntary manslaughter require recklessness—that the killing be done under circumstances showing a realization of the imminence of danger and a conscious disregard of that danger. Depraved heart murder requires the additional element that the reckless killing occur under circumstances manifesting extreme indifference to the value of human life.

. . . .

"We hold that depraved heart second-degree murder requires a conscious disregard of the risk, sufficient under the circumstances, to manifest extreme indifference to the value of human life. Recklessness that can be assimilated to purpose or knowledge is treated as depraved heart second-degree murder, and less extreme recklessness is punished as manslaughter. Conviction of depraved heart second-degree murder requires proof that the defendant acted recklessly under circumstances manifesting extreme indifference to the value of human life. This language describes a kind of culpability that differs in degree but not in kind from the ordinary recklessness required for manslaughter."

Voluntary manslaughter is a killing committed intentionally upon a sudden quarrel or in the heat of passion. K.S.A. 21-3403(a). A killing must have resulted from severe provocation in order to constitute voluntary manslaughter. *State v. Drennan*, 278 Kan. 704,

713, 101 P.3d 1218 (2004). "The test for whether severe provocation exists is objective, and the provocation must be sufficient to cause an ordinary person to lose control of his or her actions or reason." *State v. Bell*, 266 Kan. 896, 918, 975 P.2d 239, *cert. denied* 528 U.S. 905 (1999).

Inexplicably, Jones argues that instructions on all three crimes would have been consistent with his theory of defense. However, as the State notes, Jones' theory of defense was that Terrae Johnson was the shooter, not Jones. None of the lesser offenses comports with the defense theory. Moreover, there was absolutely no evidence that the shooting was the product of recklessness or that the attack was a reaction to a contemporaneous provocation. Accordingly, a rational jury could not have found sufficient evidence to convict Jones of the lesser included offenses which he proffers on appeal, and it was certainly not clearly erroneous to refrain from instructing on those crimes.

Affirmed.